1460295, Pilgrim's Pride Corporation v. Commissioner of Internal Burgundy Service, and we have Mr. Alboral. Yes. May it please the Court, my name is Bobby Alboral. Please forgive my voice, I've had a terrible cough over the last few days, so forgive me in advance. But I represent the appellant in this case, Pilgrim's Pride Corporation, which is the successor of interest to Gold Kiss. This case involves the determination of whether or not Pilgrim's Pride's loss on the abandonment of some securities constitutes a capital or ordinary loss when it's been stipulated that those securities had value at the time of the abandonment. Before we turn to some real technical requirements of two code provisions that we're going to provisions, it's pretty key that we recognize that for as long as the tax code has been around, and even before, a basic fundamental premise of tax law has been that in order to have a capital gain or capital loss, you had to actually have a sale or exchange. Now there are exceptions to that, and we're going to deal with a couple of them today, but they're congressionally mandated and they have been mandated along the way for years. This may not matter, but would you agree that it's somewhat bizarre to allow a transaction like this that clearly has no economic substance to it to allow such a tax windfall? Well, I'm not sure, Your Honor, when you say it doesn't have any economic substance. I mean, you abandoned an asset that had value for no value, for no reason other than to get a tax benefit. Well, there were other reasons in addition to the tax benefits that were associated with the abandonment of the stock. Those were stipulated in the record, and they're in the board minutes, where this decision was taken. Can you tell us about that? Absolutely. At the time that the decision was taken to do this, Gold Kiss had every desire to go public, and they wanted to go public within a number of months, and they, in fact, did. This abandonment occurred in June of 2004, and I think they went public by the time you got to October or so of 2004. So they wanted a clean balance sheet associated with this company when they went public. That wouldn't have happened had it still remained there. Now, you say, well, they could have sold it and accomplished the same thing. Selling the stock to Southern states required Southern states itself to do some refinancing and some recapitalization and the like. There were things Southern states had to do that are reflected in these board minutes that wouldn't be automatic. That is, it wasn't a matter of, here's the stock, here's the securities, give me $20 million, we go away. So the time pressure of getting this deal done required this action, apart from the tax consequences. Could they have waited? We don't know. But they would have gotten the deal done. What we do know is that was considered. Absolutely. It would have slowed the deal down. Absolutely. They also, this actually saved the company money, not in the context of the abandonment loss, but rather the way this loss played through the books of Gold Kiss actually reduced a $10 million refund that would have been paid to the shareholder. So it actually saved the company money by handling it the way they did. In addition, management actually took it. Well, wouldn't a $20 million gain minus a $10 million payment still net $10 million? Did the pure math of it have to do with it? There was also some management compensation that actually was decreased by doing this. So the management of the company, having made this decision, actually took less money by doing this. Is that in addition to the $10 million? Yes. Absolutely. So does that, do we know what that amount is? I don't know the amounts of those, but to be honest with you, kind of more directly to answer your question, besides the fact that there are these other reasons, the notion that abandonment gives rise to these tax consequences has been in the tax law for decades. It's just been there. It's just an accepted, recognized way that gives rise to a loss. Well, apparently nobody clued the IRS in on this. Well, and we have problems with that, right? I mean, that's part of the problem here. That's kind of a problem. If neither the IRS nor the tax court is in on this accepted way of doing things in the tax world, then it's probably not an accepted way. No. Well, and I misspoke. No. The tax court and this circuit is well aware of how abandonments work. In fact, the court in Echols, which we cite on brief and describe it in detail, quite specifically dealt with abandonment and recognized it as a separate and distinct legal concept from, let's say, worthlessness. In fact, in the face of the argument by the Internal Revenue Service that abandonment is the same as worthlessness, or that is you simply ought to collapse the two, this circuit didn't accept that invitation. But it's not just the circuit. Is it true that there was a revenue ruling addressing this for many, many years? Yeah. This is not, again, this is not oversight on the part of the tax court or on the part of when we get the 1234-CAP-A. I think the way Judge Dawson characterized this is, well, the parties overlooked the way this 1234-CAP-A works. And so if they just had looked at it, they'd have realized that this transaction is covered by that. Well, that's not true. What's happened here is institutionally, in addition to courts, the IRS has recognized that this abandonment concept is part of the law. And in revenue rulings, there's been recognition that you can abandon partnership interest, for example. So why are we here? If it's so well established, then why are we here? That's a very good question. And frankly, had Judge Dawson, not sui sponte, raised the issue of 1234-CAP-A under the guise of saying that the parties, and now we're talking about the lawyers, okay, in effect, that the parties overlooked section 1234-CAP-A, and it plainly applies, we probably wouldn't be here today. Well, but there's still one, the commissioner was the one that had to bring up the issue of you owe money, and that was under 165G. So what I'm saying is whatever the tax court did, it went off on some other tangent. The IRS isn't agreeing that this abandonment is automatically an ordinary loss, or we wouldn't be here, truly wouldn't be here, because we wouldn't have gotten to the tax court. Absolutely. And here's how we get here because of that, okay? Because ultimately, Judge Dawson, in a way, agreed with us on the 165G piece, because if you read his ultimate order here, we filed a motion for re-hearing, because we really wanted to give the tax court every opportunity to look at this, because we couldn't figure out how 1234-CAP-A applies, but on the other side, he said, okay, you can have an abandonment of stock or securities with value, and you can have an abandonment of stock or securities without value, just like Eccles did, okay? But what the IRS is arguing here is that what you ought to really do here is simply collapse those two requirements, and that where you have an abandonment, that equals worthlessness, boom, they're one and the same. Now, that defies a long line of cases, including the Supreme Court, in Boehm, that we brief, that tells you that you have both an objective and a subjective test for worthlessness. It's not a, if you abandon, it equals worthlessness, if that were the case. Is this the first time this was ever done in history, that the court said, combine these two things like this? It's the first time that we've found it. It's not the first time the idea has been raised, as I mentioned earlier, in Eccles, okay? Right, but that ever any court has said, you need to do it this way? No, in fact, they said they're two separate legal concepts, so Judge Elrod, that would be the antithesis of that. They've actually said, you can't combine them. So even if a court wanted to do this, are we bound to not do this? Unless you overturn Eccles, we believe you're bound. And we can't overturn Eccles, can we? Then we believe you're bound by that. So even if a court, another court would say, this doesn't seem fair and we want to do what the tax court's doing, we're bound to follow our circuit precedent on this? Yes, Your Honor, unless you want to overturn the case. Well, we don't, we have a rule that we can't overturn our precedent. Exactly. So, and so the answer to your question, we're not sure why we're here, Judge Haynes, but that's the argument, okay? So we've kind of addressed the settler exchange requirement, 165. Let's turn to the statute that Judge Dostler— If 1234A, or 1234 does not apply, we look at 165. Did the lower court look at 165, do we rule on this thing or do we send it back? Well, we believe you can fairly read Judge Dostler's ruling, this is the one area we agree with him, that you can have an abandonment of stock or securities with value, okay? Having said that, that's what he says in his order. He rules on the 1234 Cap A issue, because he finds that determinative. So we read his opinion and his order, taken together, as saying he's ruled in favor of us on the 165G side of it. He clearly ruled against us on the 1234 Cap A side of it. Okay. So you think there's enough— I think there's enough— —for the lower court to make a ruling under either statute? I think there's enough reason to rule on this case in its entirety. If we didn't, then what do we do? If we agree with you, but we're not sure that it's clear as a matter of law, and they didn't— This is a de novo review, Your Honor, so I think Your Honors can go ahead and all the facts have been fully stipulated. I think this court is free to make a ruling on this case. So there's nothing to remand? I don't believe there's anything to remand. Okay. Now, if that's something that we need to brief, if you'd like, we're happy to do that, but I believe everything's in the record that would allow you to do that. But let's turn to— Go ahead. I'm sorry, Your Honor. Can we talk about the text? I'd like to talk a little bit about the text, apart from Eccles. Okay. Would your interpretation require us to add the word contractual or derivative to the statute? No. No, Your Honor. Could you go into the text? We believe that the terminology, right or obligation, in the normal sense means contractual or derivative rights. And turning, as we now are turning to 1234A, if you look at the text of that statute, it uses terms, and what is required there in order for it to apply is you have to have the cancellation, lapse, expiration, or other termination of a right or obligation with respect to property, excluding one particular kind of contract, including yet another kind of contract. The way we read this, and we get the legislative history, but the way we read this, there's nothing about this that doesn't smack of contractual relationships, not the actual property itself. It would have been very simple to write the statute in a way, not to add the word contractual or derivative in front of those two terms, Your Honor, but if you really were going to try to get at the actual capital assets themselves, which is what the argument Judge Dawson ran with, because again, all capital assets, we would agree, have inherent property rights, but if you wanted to get at that, it's very easy to write it that way, and in fact, they wrote it that way as it relates to one particular kind of contract in Section A-2, which deals with a so-called 1256 contract. Without getting into a lot of technicalities, that particular kind of contract can be a capital asset unto itself, okay? So where Congress was dealing with a capital asset itself, it didn't use this terminology, not only right or obligation with respect to, didn't need to, it went straight to the actual asset. Now . . . What purpose does A-2 serve under the respondent's interpretation? None. We can't find a situation where under their interpretation, we haven't simply written A-2 right out of the code, okay? Now, a lot of times in these statutory construction cases, we'll get up here and we'll do kind of what you just suggested, Judge Elrod, we'll say, well, here's what Congress wrote, here's what they could have written, given that they didn't, we're right, right? Or we insert a word here or there. Here we have the benefit of some legislative history that's quite telling. Here, when this issue came up in 1981, there was concern over particular kinds of contracts, okay? People were manipulating the terms of contracts and getting ordinary gain or loss when they might have should have got capital gain or loss, whatever was most beneficial, right? There was concern with that. Well, given that this debate over the years about when you have a sale or exchange and when you don't has been there, granted, we admit to that, and there's been legislation over the years to deal with it, Senator Moynihan said, you know what, why don't we do this? Let's cover any disposition of a capital asset. And so he proposed language that would have eliminated the sale or exchange requirement altogether, okay? Anytime you have a disposition of a capital asset, bingo, you've got capital gain or loss. If that would have been enacted, okay, that would have been enacted, then we really wouldn't be here today. The abandonment would be a disposition, and we'd have capital gain or loss. It was refused. Pardon? Yeah, that did not exist. And in the end, what happened is instead of doing that, all right, we had this very narrowly tailored language that quite clearly isn't what he said, and it's very clear what he said. It was quite simple, right? Well, you know, there are many critics of using legislative history, and they say that you're looking for your friends in the room. You're saying you'd be very popular in the room under the legislative history. Would you have any enemies whatsoever in the room? We can't find anybody in the room that disagrees with us. When we look through the legislative history of these provisions, we don't find anywhere where they deal with capital assets themselves. So there's no one person that got a little statement in there that said, really, we're doing this anyway, even though— Well, in the present losses, this is important because Judge Dawson, in his opinion, found most significant a particular reference in the legislative history of this provision to a case that dates back some 60-some odd years, Fairbanks. We briefed it, but we'll describe it because it fits right into what you're talking about. He found most significant, the IRS has kind of backed off on that and said, fine, it's notable, okay? But in the present loss section of the legislative history, and let's step back, in the legislative history of these provisions, you have present law, it describes kind of the state of play as it stood then, kind of reasons for change, and then explanation of the provision. In the present law discussion of the legislative history, you have Fairbanks that's mentioned, okay? It's a case that got dealt with by another statute 60-some odd years ago involving the redemption of a bond, and what Judge Dawson says, looking at that and ignoring the fact that it's not in the other parts of the legislative history, says, ah-ha, there's a capital asset unto itself, that's what Congress was trying to get at, 1234 cap pay must cover it. In our view, that completely ignores the flaw in the fact that, one, it was dealt with by another statute decades ago, okay? And two, it's in the present law section of the legislative history. So to answer your question, we can't find anybody in the room. So Senator Moynihan didn't slip it in there, even though he didn't get his amendment? He did not slip it in there, and Treasury actually viewed Moynihan's proposal quite favorably, and we quote that in the brief as well. We understand that whereas the IRS might like to read this requirement out of the code, it's not their job to do that. It's Congress's job to do that, and it's evolved over the years to do just that, and that's where we are with these provisions. Thank you. Thank you, Your Honor. Rubin? May it please the Court, my name is Jennifer Rubin, and I represent the Commissioner in this case. I would like to begin by addressing the Echols case, which came up in my opponent's argument, and there was a suggestion made that it somehow precludes our arguments here, and it almost kind of sounded like there might be some belief that it precluded both 1234A and 165G. As of number one point, Echols had nothing to do with 1234A or 165G or characterization of the loss at all. It was a question, was there a loss? Period. End of story. Secondly, it had nothing to do with securities, and could not have been interpreted as interpreting 165G. Thirdly, the question that it had, and most particularly in Echols 2, that's the reconsideration opinion, the question there was whether abandonment was required to establish worthlessness, not whether abandonment can establish worthlessness. Put another way, was abandonment necessary? The Court said no. But everybody stipulated this asset was worth $20 million, so we're not debating some fact question of how much this is worth. You agree it was worth $20 million? It was valued at $20 million prior to the abandonment. Okay. But we believe that by— But if abandonment always equals worthlessness, then there is no difference between abandonment and worthlessness. So then you read out that whole area of the law, it seems to me. So if the thing is valued at $20 million on day one, and then on day two they say, okay, we're going to abandon it, then you can't say the abandonment proves it was worthless. Well, that's certainly a position the Treasury took. If you look at the preamble to the proposed new regulation, Treasury Regulation 1.165-5i, they said, look, when you abandon something, you establish both the subjective and objective elements of worthlessness. If we disagree with you, would we have to remand for some determination of whether it's worth $20 million or not, or is the evidence in the record and there's nothing to remand? We certainly believe—there was a stipulation that it had a value of $20 million prior to the— So we could rely on the stipulation. I think it depends when you actually measure the value. Is it at the moment of abandonment, when you say, I'm not going to take anything for this, I'm not going to take any value? That was a decision that was made by the Board of Directors. If you look at Exhibit 1-J, at 4, they say, we're doing this because we want to get an    We think that's going to wipe out our tax system. We think that's going to wipe out our tax system. They said there were other economic reasons. Do you disagree with that? Do you think the—is the evidence such that the sole reason was the tax benefit? Certainly. The fact that it was the tax benefit was the reason that they were giving. They said it was to generate an ordinary tax loss. They did mention a few other things, but they said that they would—the main benefit was that they were going to get an ordinary tax loss. Okay. But was there any other economic reason for this? They did say something— They said it was to get this deal done, to save paying the shareholders.    I do. I do. I do. I do. I do. I do. I do. I do. I do. Well, what they said was that the shareholders—actually, I believe if you look at that page of the record, the shareholders wouldn't get any different payment versus whether they took , from southern states or not. There may have been some indication there that is might have been faster to do it this certainly, they said the abandonment strategy was in order to generate ordinary tax loss. This is also what the tax court found. And does that make it automatically wrong? Let's say for the moment that the only economic reason was a tax loss. Does that automatically answer the debate? Because I know that the tax laws have attempted to evolve to avoid people doing weird things just for the tax benefit and not for economic reasons. Because, you know, it used to be like in the 70s that everything was a tax shelter and there's all this, you know, chicken farms and whatever. And so I'm asking, while I understand that may be the purpose of some of these changes in the tax law, is that in fact a requirement that there be an economic reason for an abandonment like this beyond the tax benefit? No. I think that if it fits within the statutes, then it fits within the statute regardless of what your purpose. Even if they come up and they say, here, we have evidence of ten other great purposes.  You know, they did an abandonment in order to, and saw an ordinary loss, and we're saying they couldn't do that, even if they had great reasons for why they chose abandonment. So you're not saying it's bad because it was only for tax reasons. That's not your issue at all? No, absolutely not. I mean, I do think that given that a justification, a big justification they identified was this, it does establish that it kind of falls within the concerns that Congress had when it enacted actually both of these statutes.  The first one was for the predecessor to 165G, as well as the 1981 and 97 legislative history when they enacted, and then expanded 1234A. The concern was character manipulation. Can you help us? You said that ECHLs and ECHLs II are not relevant or something because they don't deal with securities. ECHLs and ECHLs II, of course, deal with worthlessness and abandonment in the context of partnership interest. I don't see that the commissioner offers any reason why worthlessness should have both objective and subjective components in the context of partnership interest, but only a subjective component in the context of securities. Could you elaborate on that, please? As I mentioned, if you look at the preamble to the proposed treasury regulation, I believe the number for that is FR41468-01. They say that in the commissioner's and the department treasury's view, abandonment establishes both subjective and objective proof of worthlessness. Right. That's not the answer to the question, though, the fact that they proposed a regulation to do that. In fact, that cuts against you because why would they need to propose a regulation if it already did that? My question is, why logically would you treat worthlessness with the subjective and an objective component for partnerships and not for securities? I'm not saying whether the treasury department might want to do that prospectively, but why logically, under the existing law, why would we review it that way? What I'm saying is neither us in this case nor the treasury department in that regulations justification are fighting the concept that there are both subjective and objective indicia of worthlessness. What I'm saying is that we believe that abandonment establishes both. It is objectively worthless because it no longer has any value to you. Senator, it gets back to the economic substance. I mean, to me, I could decide that abandonment establishes both. I could decide, if I have a second home in California, that the taxes and the upkeep are just too much trouble to deal with, and so I'm just going to give it back to the state. Maybe there's a tax lien on it, whatever. I'm just going to give it back to the state. That doesn't make that house worth or the bank or whoever. It doesn't make it worthless. It just means that I've decided that the benefits of owning it are outweighed by the detriments of owning it. So the house still may have value. In fact, it might be a million-dollar house. That's what we know. It's useless to you. You've determined there it's useless to you. And again, the plain English and an accordment. But that gets away from the idea of worthlessness being subjective and objective. So in other words, something that's worthless to me may be very valuable to you. My notes today may not benefit me a lot, but you might be really interested in what they say, you know? But I could be holding, if I'm holding onto something, then it's useful to me if it has any value. But if I abandon it, then I'm saying it's useless to me. But it is also an objective establishment of its uselessness, because I've actually abandoned it. I've actually said I'm not going to hold it anymore. It's kind of a circular definition you're making. I mean, you've agreed that this thing is valued at $20 million, and yet you're saying it's objectively worthless, because these guys, for whatever their reason, think it's worthless to them.  It's just plain English, and it has two different meanings, valueless and worthless. To me, plain English doesn't allow for worthless to encompass a $20 million asset. I mean... In all events, this only goes to 165G. Even if you... I mean, for example, I give clothes to Goodwill. They may be worthless to me, but somebody really wants to have those clothes, because they're very valuable to that person who has no clothes. Is that... Are those clothes worthless? Well, you probably took it to... You probably took it to Goodwill there. Okay, and so the fact that I can take a deduction on it, which they could too, because there's no dispute they can take a deduction. It's a question of whether it's a capital loss and has to be only taken against capital gains, or whether it's an ordinary loss. But they're getting some tax benefit either way. But what I'm saying is, is this... The outfit I'm wearing today, if I give it to the Goodwill tomorrow, is it suddenly worthless? The fact is, to the person who gets the outfit, it may be the most wonderful dress they've ever owned, even though to me, I no longer want it. In terms of the concept of worthlessness, in the context of securities, we would submit it's a bit different, because it is a question of trying to determine whether it should be an ordinary or a capital deduction. In the situation where you're trying to get rid of a tax lien, you're trying to get rid of something, you get a value from having gotten rid of it beyond a simple, you know, turning it away. But you're saying the economic... So then we're back to this whole issue of whether there's an economic purpose beyond the tax benefit. You earlier said to Judge Elrod, that doesn't matter. Now you're saying it does. No, what I'm saying is that when you look at 165G, the purpose of 165G and the reason we think you should read it broadly to encompass both the plain English meanings of worthless is because here, the abandonment really was the economic equivalent of a sale. They just didn't have... They didn't get any consideration, to be sure. But what Congress... That's a different question. Saying it's a sale is a different point than saying it's a sale. It's not saying it's worthless. But what Congress said in the legislative history that backs up the predecessor to 165G is they were concerned that people were taking worthlessness deductions and they were getting an ordinary loss for it, even though, really, from their perspective, they lost capital. That's what they did. It's the same as if they sold it at a loss. And so what Congress said... I can't wait for them to say that. If any security which is capitalized becomes worthless or is abandoned or donated for no consideration or... There's a lot of things you could say that would encompass this idea of just getting rid of something if we don't want that to be an ordinary loss. I mean, it may be there's a gap in this statute. It may be the intent of Congress was exactly that this is treated as a capital loss and not an ordinary loss. But it's up to them, up to Congress, to write these things correctly, not up to us to just  Well, I believe you might be right. Our position on what worthless means is fully stated in our brief. But turning, I think, if I may, to 1234A... Well, before you do, could you just... I'm still not sure whether you believe that we need to remand if you lose on the 1234A. It's really unclear to me. Are you saying we don't need to remand and we should just decide the case? Certainly, I believe if you agree with us, you can affirm on any ground that appears in the record below. As to whether you believe we need to determine whether the value and when... You could determine what the standard is for when the value should be measured. And if you believe that you need a further fact-finding based on the standard that you established, then you might decide you need a remand. But we could rely on the stipulation. If you decide that the stipulation, that the value before the abandonment is the standard, you have a stipulation. Okay. Thank you. Turning to 1234A, if I might. We believe that the plain language clearly covers both inherent rights as well as what they're calling derivative rights. Is this the first time that this interpretation has been made by the Commissioner? Has it been used in this way before, or is this the first time? I found very few times when 1234A has been cited anywhere. You know, I key-cited the case, looked everywhere. The statute looked everywhere. There's been very little development of it. And certainly, this is the first case that's been cited. It's the first case of this kind that I've seen. If you believe that the plain language of 1234A governed this circumstance, then why wasn't an argument made about 1234A in the original briefing to the tax court? Why did the tax court have to bring this up sua sponte if this was so clear from the plain language of 1234A? I think it's a simple matter that individual attorneys, either at the IRS or at the Department of Justice, we don't know every provision of the statute. We don't know every provision of the Internal Revenue Code. Had the IRS ever made this argument in litigation prior to this case? I'm not entirely certain whether they had or not. There were some older cases where they tried to bring up 1234A, and it was concluded it was at before the effective date. That's the Stoler case. But beyond that, I'm just really not sure. So this wasn't even on the IRS's radar screen until the tax court sua sponte brought it up? From what I can tell, that there was a lot of focus on the fact that there was a specific provision that the particular attorneys here believed applied, namely 165G. They didn't go looking to see if there were any general provisions that they thought, oh, this might also be an alternative argument. It might have been great if they did, but again, you know, I know I personally don't know every provision of the tax code. And it would be impossible to. Well, certainly. Or any sort of worrisome for the ordinary taxpayer, but we digress.  I think the question here really is not whether I should have known about 1234A before I got this case or not, or whether someone else should have, but whether 1234A applies. And we submit that under the plain language, the plain English of it, as well as comparing it to other provisions of the Internal Revenue Code, it does apply to this case. What purpose does 1234A2 serve under your interpretation? It mostly seems to have been a clarification. There seems to have been some concern that as they broadened Section 1256 contracts, those were regulated features contracts, to have different sorts of terminations and different sorts of contracts, that there were going to be claims that those were not covered by 1234A, and it was done to clarify. Is it superfluous? I wouldn't say it is superfluous. For one thing, the concept of termination by offset, which seems to be, from what I can tell, unique to 1256 contracts, it wasn't clear that that would be covered by 1234A. And what basically 1234A2 does is it says, no, it's covered. But — Doesn't your interpretation put 1234A1 in conflict with 1234a1? We don't agree that it does, but even if it did, the specific provision, which deals with option contracts, that's 1234a1, would trump 1234A1. But I would also throw in there, you know, if you interpret their contracts as being 1234a1, the way that the taxpayer does here, it renders 1234a1 completely superfluous, as well as the portion of 1234Ba1, which deals with termination of securities features contracts. It is very clear. 1234a1, 1234ba1, are look-through rules. The language there is extremely clear. You'll look to the property underlying these contracts. And it says that's how you determine whether it's a capital loss or an ordinary loss. Under the taxpayer's reading of Section 1234CapA, it's a look-through rule. It doesn't use the same language. It doesn't mention derivative. It doesn't mention contractual. It doesn't mention anything that actually seems to say, look to the property below, underlying something. But they say it's a look-through rule, so why would you even need those provisions? It would render those things completely superfluous. There would be no reason to have those provisions under their interpretation. So even if there was some superfluity that arose from our interpretation, there's superfluity that arises from their interpretation, at which point you should really just go with the plain language. What if there's conflict, though? There's alleged superfluity on both sides, but then there's conflict on your side. We don't believe that there really is a conflict, but in all events, 1234a1 would win because it's a specific provision specific to option contracts. So if you sit there and you say, here's a general provision, 1234CapA1. And here's 1234a1. For option contracts, you simply look over at 1234a1. You were talking about the legislative history earlier. Do you agree that you have some enemies in the room? I would not say that I have enemies. What I would say is I have— Not in this room. You know, I'm using this, and certainly not— In irrational chambers, I'm using, you know, this phrase that you look to your friends in the room. I'm certainly not saying you have any enemies in this room. No, I mean, I certainly think the conference report talked about dispositions of commodity-related property, that that's what the House bill was intended to do. The only amendment that was made in conference to it was to change commodity-related property to actively traded property as defined in Section 1092. Property, not contractual rights-related property. Not derivative rights-related to property. Dispositions of property. That sounds like a very good friend for the government's position here. But in all events, if you look at both the 1981 and the 1997 legislative history, it's very clear that what they were concerned about was a situation where somebody might be able to, through selective choices of how to dispose of property, certain types of terminations, be able to elect how their losses would be characterized. And there was a great deal of talk about all of this. All these, the general evils. And what the taxpayer says is, oh, don't pay attention to the discussion of those problems. Pay attention to these few little examples that they gave of how they think, of ways that the bill might apply. Is it true that the Treasury's prior interpretation is consistent with your opponent's position? That it's consistent with it? Yes. We disagree with that conclusion. Okay. Is it true that the two prior administrative actions reveal that before this case, Treasury and the IRS agreed with Pilgrim's Pride interpretation of 1234A1? Can you address that? Which ones are you talking about? The two prior 1993 revenue ruling. Okay. And the 2007 regulation. And also, revenue ruling 9380. I think that's what I'm talking about. 9380. 9380 would be, so all of that. Okay. Let's start with revenue ruling 93-80. That was before the 1997 bill that broadened 1234A, Kappa A, to cover, my time is over. Can I continue? Yes. Go ahead. 1234 Kappa A, to cover all kinds of property, which was deliberately done because they felt like it was too narrow. That's what Congress said.  That there's any reason to think that the partnership interest there was actively traded personal property under 1092. You know, you have to look at the facts of any revenue ruling to determine how it applies. There's nothing in there indicating that these were actively traded partnership interests. So the fact that it didn't cite 1234A doesn't really say anything about how the IRS thought 1234A should be applied. And subsequently, the law changed. We don't believe that revenue ruling 93-80, you know, especially since it didn't really deal with 1234A, really tells you how you should be applying 1234A. Okay. Thank you. Thank you very much. There is a tax that we charge if you go over your time, so I just. There's not going to be any risk with that. I'm going to be very brief. I'm really just going to address some of the last points that you got into, Judge. Involving the kind of the institutional acknowledgement of the position that we're taking. And as I mentioned earlier, the notion that Judge Dawson raised this to his spontee. And if it was so plain on its face, how in the world wasn't it raised before? Well, the IRS just can't read all the provisions of the tax code. Well, it's not. It's more important than that because it's not simply the lawyers in the case can't know every provision of the code. We certainly can't know every provision of the code and don't profess to. Okay. This was bigger than that. This was institutionally. The Internal Revenue Service and Treasury had taken the position that 1234 CAPA was much narrower than that. That's reflected in the regulations that you mentioned. If you're going to issue a regulation, then you do have to do a comprehensive search of all of the aspects of the code that the regulation might impact. And so while one lawyer may not know it all and we understand that. Absolutely. If you're going to issue a regulation. A regulation is a different animal. And when you issue regulations that are directed quite specifically at this very kind of transaction. And nowhere in any of it is referenced 1234 CAPA. It's not surprising that the lawyer who's representing the IRS in this case wouldn't have thought 1234 CAPA applied. Not only that, let's not just go with silence. Okay. Let's go with affirmative statements. In a revenue ruling 2009-13 issued after the enactment of all this stuff. Okay. That's a long time. Not 93-80, which we still think is relevant because they never modified it. I think Judge Dawson says, well, they don't have to do that as soon as they find out the law is different. Well, we would say 17 years is an awfully long time. Okay. But putting that aside, in 2009 they issued another revenue ruling dealing with life insurance contracts. So at least we got contracts in play, right? So you say, well, 1234 CAPA, that's a contract. But a life insurance contract is a capital asset. All right. Remember what we talked about earlier, 1234 CAPA deals with, in our judgment, contractual relationships, derivatives and the like, where the underlying property, here's the look-through, where the underlying property is a capital asset. Well, in this revenue ruling they were dealing with a life insurance contract itself. All right. And they look at it and say, well, okay, it's a contract. 1234, antenna go up. They look at it and say, no, we're dealing with a capital asset itself. And expressly state that 1234 CAPA has no application. Okay. We also have CCAs. Now, those CCMs, those are chief counsel memorandum. That's where the lawyers for the IRS in the government are issuing memoranda that says, here's the way we as the IRS lawyers are interpreting things. So when you're the lawyer in this case before the court and you're looking at what position should the IRS take in this case involving Pilgrim's Pride, you go, okay, well, it's a 165 case. We're dealing with property itself. We're not dealing with derivative rights. What do I do? You go look at these two CCMs that we quote. And granted, they're not precedent. They certainly are helpful. They quite specifically say 1234 CAPA applies only to, lo and behold, derivative rights. So it's not an oversight on the part of the good lawyer that was representing the Internal Revenue Service in this case. It's the institutional position that 1234 CAPA. But in the end, we got a good lawyer. In the end, you do. Even if the IRS has gotten this wrong for a hundred years. For decades. You're correct, Your Honor. We would submit that the language is pretty clear on its face. So thank you, Your Honors. Thank you, Mr. Albarral, and thank you, Ms. Rubin. And court will be in recess until 9 o'clock tomorrow morning.